The next case called 124019, Lakewood Nursing and Rehabilitation Center v. Illinois Department of Public Health, Agenda Number 8. Ms. Winder, are you ready? You may proceed. May it please the Court, my name is Laura Winder. I'm an Assistant Attorney General here on behalf of the Department of Public Health. The question before the Court, and this appeal is whether the time frames in Section 3411 of the Nursing Home Care Act should be construed as mandatory or directory. At issue is the construction of the 10-day time frame for involuntary transfer or discharge hearings and also the 14-day time frame to render a decision. The Department is asking that the Court construe those time periods as directory. This Court's provided a framework for analyzing a mandatory directory question, and I'm going to address that framework in more detail. I think it's helpful to start with the first principle, though, and the Court's emphasized that, like any statutory construction question, a mandatory directory question is a matter of legislative intent. It's your position, I take it, that if the hearing was mandatory within 10 days and it was not held, there's no hearing and the facility could simply discharge the resident. Is that correct? Yes, we believe that that's the effect of the Appellate Court's ruling, and that ties into the main point that we believe the Appellate Court overlooked. A mandatory construction would warrant legislative intent, not further it, because as part of many protections for nursing home residents in the Nursing Home Care Act, the legislature gave residents the right to remain in a facility except for certain limited circumstances, and along with that, the legislature gave residents the right to contest involuntary discharge. And to do that, they created a whole hearing process that ensures that the residents facing involuntary removal can receive a hearing before the Department, which is a neutral decision-maker, if the resident decides to request a hearing. Not all residents do, far from it. And then regarding tiding away the 10 days and the 14 days, the Appellate Court's construction resulted in a situation where if the hearing is not held within that 10 days, then the Department cannot hold a hearing at all, and that residents' right to contest involuntary removal would be eliminated. And given that the legislature created this whole hearing process, it's very hard to conclude that they intended to eliminate the very protections that they put in place whenever that hearing couldn't be undertaken in 10 days, and regardless of the reason for extending the timeframe, because a mandatory direct reconstruction applies across the board. It doesn't look at any specific circumstances or reasons. So that's the effect of the Appellate Court's decision, and that would undermine legislative intent, not promote it. Do you think that Lakewood is arguing that there still has to be a hearing even outside of 10 days before it can discharge? Their argument is that the Department loses jurisdiction and can no longer take action. It would follow from that that I take their argument to be then they can just proceed with the discharge, not we have to start all over from the beginning with a new hearing. I can ask them that. And with that, we can turn to the Court's guiding framework. We start with a presumption that procedural... Can I go back for a second? The statute is designed to protect, right? And the people, you mentioned the people that the statute is designed to protect. But under the Department's interpretation, is there anything to be said for the facility suffering? As a result, there might be less facilities to provide care because maybe they go into bankruptcy. And this would generally, I know we talked about the specific resident, but would this generally detrimentally impact nursing home residents? Could that be argued as far as the reason for a mandatory interpretation of the statute? I think we think in terms of the specific. I'm trying to look at the general. Well, in general, a mandatory interpretation is far more detrimental to residents than any benefits they might receive because a mandatory interpretation eliminates the hearing process outside of the 10 days for residents. You mentioned that, well, the facility has some interests here as well. And I'll talk about those in more detail. But I think the bottom line there is a prompt hearing benefits both the residents and the facility, but it doesn't follow from that. I don't think it's a tenable statutory construction that if that hearing is not held within the 10 days, then the legislature just wanted to eliminate the very process that it created to protect residents facing involuntary discharge. But doesn't Section 3403 specifically notify the resident that it's no later than 10 days after your request? Doesn't that show the legislature's intent for mandatory? I don't think that reference in the form, that's the language of the form, creates a mandatory intent. There's an intent that the hearing should happen in 10 days. I think that's referring to this mandatory permissive dichotomy where the legislature specified 10 days. That was the time that these hearings were supposed to take place. But like many timetables, that is an aspirational time period. The question that's presented here is what happens when the promptness that the legislature is seeking doesn't happen in a particular case. And it doesn't follow from the fact that the legislature put in a timetable, that if that timetable wasn't followed, it wanted to eliminate the entire process that it put in place for the protection of residents. But isn't that adding more words to what the legislature actually said, later than 10 days after your request, no later? Well, I don't think the language then gets back to the language no later than 10 days. The language in itself doesn't, I think we have to look, I think the appellate court here placed a lot of emphasis on the language no later than. That was the entire basis for the court's decision. And that's very hard to square this court's precedents that have looked to not simply whether there's any language that could be remotely construed as negative, but whether there is negative language that prohibits further action in the case of noncompliance. And this court's recent precedents have looked to focus on whether there is some consequence specified for not meeting that time frame. And that's not the case here. The mere words no later than, effectively, are not different in ordinary meaning from saying within. At best, that is inconclusive about legislative intent. There are multiple decisions that we refer to in the briefs that talk about whether there are any consequences specified for noncompliance, if you're just focusing on a certain language. It's worth mentioning a case called In Re James W., which involved continuances for involuntary commitment hearings. And the statute there said that continuances shall not extend beyond 15 days except in certain circumstances. And the court determined that shall not was not this type of negative language prohibiting further action because there was nothing specified, such as in that case the petition shall be dismissed. And the situation here is not meaningfully different, where we have the phrase no later than 10 days. At best, no later than 10 days would be an inconclusive indicator of legislative intent. There's nothing about that language that says clearly that the legislature intended to withdraw protections of an administrative hearing if the hearing wasn't held in 10 days. So under a meaningful inquiry into legislative intent, the appellate court should proceed to consider other indicia of intent. And there are a number of those that are discussed in the briefs. There are a few that I'll mention here. Most importantly, I think this is where we get back to the legislature's fundamental objective of protecting residents. That's an objective that underlies the Nursing Home Care Act as a whole. It's demonstrated in many ways that the focus of the act is on the protection of residents, and that is paramount. And more specifically, it's demonstrated in the act in the legislature's limitation of the reasons why a facility can discharge a resident and creating an entire administrative process that allows the residents to contest the loss of their care and their residence, and to make sure that that is not wrongfully done. So the legislative purpose, I would say, is the most important consideration that is overlooked by the appellate court. Additionally, we read statutes as a whole, or the courts do, in construing statutes. And this 10-day timeframe was not the only thing that the legislature pronounced about how involuntary transfer-discharge hearings should be conducted. They didn't just specify this 10 days or this 14 days in a vacuum. The legislature also incorporated, and this is specifically for this type of hearing, a number of detailed and time-consuming procedural requirements that are at odds with completing those hearings in 10 days and 14 days. And these, again, are detailed in the brief, but some of those are that participants have a right in this type of hearing to obtain an attorney. Subpoenas for witnesses and documentary evidence are permitted in this type of a hearing. There's a multi-step administrative process specified where there's an ALJ recommendation and then a final decision by the director. And the point here is not for the court to reconcile all this, but just to recognize that these are additional provisions that are part of the CARES Act as a whole. And the legislature specified them in this particular context. So it's, and these are requirements that would be incompatible with inflexibly adhering to the timeframes in every case. And it's hard to conclude that the legislature intended to cut off this department action outside 10 days when the legislature expressly told the department to either do things or to permit things that almost certainly could not happen within the 10 days. And another consideration that the appellate court did not take into account that pertains to legislative intent is that a mandatory construction risks putting Illinois in noncompliance with federal law. And it's unlikely that that is a result that the legislature would have intended. And that's because under federal law, states participating in the Medicaid program are required to have in place a hearing process whereby the residents can challenge a facility's decision to involuntarily remove them. Was this resident a Medicaid patient? This resident was a Medicaid applicant, but the obligation to have this hearing procedure in place under federal law applies when the facility participates in the Medicaid program. Even though the patient who is being discharged. If the facility participates in the program, then the facility has to comply with the federal requirements that are part of that program. For all their residents? Even their non-Medicaid patients? So I think the bottom line for the negative language exception is that under a meaningful inquiry into legislative intent, we can't conclude that the presumption of direct reconstruction is overcome. I'll mention very briefly the Francis House decision which was relied on extensively by the appellate court in which a different timing provision of the Nursing Home Care Act was construed as mandatory because of language that said not to exceed 90 days. Of course, that's not a decision of this court. It predates the court's most recent guidance that clarifies this analysis. It involved different language and purposes. I think most importantly, the effect of that decision was to curb the department and its enforcement functions. In that scenario, it was the department that was initiating an enforcement action. So if the department didn't complete that action within the time frame, then the department couldn't proceed. So the effect of the delay fell back on the department. This is a very different situation where the effect of exceeding the time frames falls back on the resident who is not a party. The effect here is to eliminate the statutory rights that are accorded to this protected group based on factors outside that group's control. So the effect here is to penalize the residents based on timing that is out of their control. It also does not allow the department to accommodate the resident's need for continuance in any particular case. The mandatory directory just cuts off action outside of its time frame. So if the resident was ill, for example, and needed additional time, or if the resident wanted to obtain an attorney, as the resident is entitled to do under the statute, none of that can be accommodated under a mandatory district. Counselor, your argument with respect to the federal law and the loss of virtually appellate rights for the nursing home resident, isn't that all taken away by the department if we deem it mandatory just having the hearings within the 10 days? Compliance with a mandatory provision for 10 days would not be in violation with the federal law. The right for the nursing home resident to have their individual case looked at would not be violated if indeed the department, if we found it mandatory, would have the hearings within 10 days. Well, if the court did that, it wouldn't follow that a hearing could be conducted within 10 days. It would just have the effect of eliminating the hearings outside of the 10 days. So even if the department then did its very best to proceed in every case and have these hearings within 10 days, the result would be a loss in meaningful decision making because there would be instances when the resident was not able to meaningfully participate in that time frame. And the loss would not be able to take into account other procedural requirements that the legislature has also specified, such as I've listed a few, subpoenas, the attorneys, et cetera, that could not in all likelihood take place within 10 days. But that's an argument for the legislature, right? They could change the statute. Well, I think it's for the court to decide whether the time frames that the legislature... Yeah, I'm premising on the hypothetical that if this court determines that it's mandatory, I mean, that's really our concern, right? Is it mandatory? Is it discretionary? Our first concern and what the legislative intent was if there isn't a plain reading and all that. I mean, we understand the law on that. But the arguments that somehow the nursing home resident is hurt and the federal law is being violated don't necessarily mesh with that, right? Because of the fact that if it's 10 days, it's 10 days. You have to get it done within 10 days.  And maybe the problem of the department going across the street and trying to have a law change, if that's what we determine. But at the end of the day, the court's constrained the statute that's in front of it now. And it's very difficult to conclude that having created an entire hearing process for the benefit of residents, the legislature would also want to eliminate the very process that it created when that couldn't be completed in 10 days for whatever reason that might be. You would have to conclude that the legislature wanted to nullify the very process that it created. And I think that that's a very difficult construction given the legislature's fundamental objective of protecting the rights of the residents. And I see that time has expired for my argument. So for those reasons and those in the briefs, we would ask that the court comply with your construction. Thank you. Ms. Turner? Good morning, your honors. May it please the court. I'm Holly Turner, and I am the attorney for Lakewood Nursing and Rehabilitation Center. And we are here on what is essentially a very easy statute with very stipulated facts. We have a very clear statute that uses very specific language, which says 10 and 14. And by 14, it's 14 days after the hearing request, which really makes it 4 days after the hearing if the hearing takes 10 days. This court is not here to decide would it be better for the residents to have an unlimited amount of time. That's not the issue for this court. That's not the legal test, and that's not the issue. The issue, which was avoided completely, similar to I guess a law school student. You get a question, and you're like, wow, that's a really hard question. I'm going to change the question, and then I'm going to answer that question because it's easier. What has not been addressed is the test of does this injuriously affect public or private rights? You're not going to find an answer to that in the Department of Public Health's brief. They just chose to ignore the legal test because that's difficult to answer because, of course, it affects public interest and private rights. It was remanded the first time because of that. It was never appealed. There's no question it affects public interest and private rights. Just tie that back to, if you could, the test that the courts have developed in terms of how we look at mandatory directory is whether private rights are at stake or not an aspect of that. Has any court held that? I'm sorry. What is the test to determine whether it's mandatory or directory, and does the fact that individual rights or property rights are affected play into that? What court has said that? Yes, Your Honor, it has. The test for whether or not the Kerrigan, which is the Illinois Supreme Court, this very court, said in Kerrigan v. Illinois Liquor Control Commission, ordinarily a statute which specifies the time of performance for an official duty will be considered directory only where the rights of the parties cannot be injuriously affected by the failure to act within the time indicated. However, where such a statute contains negative words, denying the exercise of the power after time named, or when it disregarded its provisions, would injuriously affect public interests or private rights, it is not directory but mandatory. So the question is, does this contain negative language, or does it injuriously affect public interests or private rights? And although that is a case from 1960, it's an Illinois Supreme Court case that's never been overturned because that's been the test that's been applied continuously throughout various cases. That test was iterated again, which is specified in the brief, in the people of the state of Illinois versus $4,850. And in that case, which is cited at page 12 of our brief, the court goes through a long mandate of how some statutory procedures only promote order and efficiency in government workings. However, the law will not tolerate a sacrifice of the other value, the rights of the citizens. So the question to be decided by ascertaining whether any advantage would be lost or right destroyed or benefit sacrificed, either to the public or any individual. So it's not limited to just the residents in the Nursing Home Care Act. But that's the easier law school question to answer. The more difficult one is what about public rights? And I'm standing here as the public in terms of being a nursing home that's involved in this particular action. And the interpretation, I guess we can start at the beginning because I believe we've leapfrogged a little bit here. First of all, the statute is not ambiguous. And I think that's the first step this court looks at in legislating the 10. Is it ambiguous? No. 10 is 10. 14 is 14. Not is not. This is not some as soon as you can, when you want to. That language is used in the Nursing Home Care Act, just not in this provision. Does it make a difference if the legislature said within 10 days instead of about later than 10 days? Is there a difference? Legally, I think there is because negative language in the cases that have been interpreted under the Nursing Home Care Act indicate that the word not, such as in Francis' house, you have to do it using negative language. The use of the word not and no conveyed a mandatory interpretation under the Nursing Home Care Act. As the nursing home stands, I don't think it would make much of a difference because here's the second problem. It's unambiguous. I agree with the Attorney General's position in one respect. You look at the statute as a collective. The brief that we set forth contains the 34-day cycle that the legislature intended for this entire process to take. 34 days, that's a very odd number. It's not 30, it's not a month, it's not 60, it's 34 days. And we calculated exactly how that 34 days was done, which included four days to issue the opinion and 10 days for the hearing request. If we invalidate any provision of those two, this 34-day cycle doesn't exist anymore and the other statutory provisions of the Nursing Home Care Act, as it relates to discharge, would be rendered meaningless. How do you account for the whichever is later language in 3-4 through 10? The time for leaving the facility. The whichever later is what if the resident gets a hearing in two days? The department doesn't take 10 days to do the hearing. They request a hearing and it's done within 48 hours. The opinion comes down four days later. That resident would get to stay longer. She's shorter because she gets her hearing in two days, his hearing takes 10 days. He got to stay in the nursing home longer than her. So whichever is later for the calculation means that every resident is treated equally. They get a 34-day cycle, which allows them to stay in the nursing home the same exact amount of time, whichever is later. Everybody gets the same amount of time, depending upon when their hearing takes. That way somebody's hearing isn't pushed forward first because potentially we don't like you. We want your hearing first over this person who hasn't paid. So I believe that the whichever is later language encompasses a fairness of how the residents will be treated with how quickly their hearing gets done within the 10 days. Does that make sense? I'm hoping I'm conveying that accurately. That's what that language is intended. Okay. In this case, there was some deferral of this because the resident had applied for Medicaid, right? That is correct. There was a stay that was imposed. The stay was not objected to by the facility. Now, legally, I don't believe that the statute calls for a stay. The Department of Public Health believes that. We made a deliberate choice not to appeal that in this case because we had enough. We chose the three issues we wanted to bring forward first. I don't believe there is a stay. But we didn't object to it at that level, so we can't object to it on appeal. And in terms of how long it took after the stay was lifted, that's the only time period we're even calculating here, which is 112 days. We took a 10-day and a 4-day process into 112 days. And that's after any potential stay had been lifted. No excuse, no request for delays, just the department saying, we're not giving you a hearing. Did you say that the facility agreed to the? I guess you said they didn't object. That's correct. The ALJ imposed a stay or just said we're waiting until we hear back from Medicaid. And the facility at that time did not object. Then the application was denied. Once the application was denied, which is what the record reflects, once the Medicaid application was denied, which is a stipulated fact, for transferring the asset to her daughter, the Medicaid application was denied on January 13, 2014, which is stipulated fact number five. Stipulated fact number six is on January 15, Lakewood's attorney informed IVPH of the denial and requested that the discharge hearing be set. That never occurred until March. Nothing happens, nothing happens, nothing happens, nothing happens. Finally, in February, a pre-hearing is held, which is in the record. On February 10, January 15, Lakewood immediately communicates, and that's a stipulated fact to IVPH, let's set the hearing. It's time to go, 10 days, tick-tock. Department ignores the request. February 10, IVPH schedules a pre-hearing, refuses to schedule a hearing on that date. Following that pre-hearing, where no hearing got scheduled, on February 10, Lakewood filed a motion to dismiss. They couldn't get their hearing. It's been more than 10 days. They can't get a hearing. And I think the problem in this case, which is unique to some others, is that in interpreting this statute, the issue is going to be if it's interpreted as directory. And there's been no excuse. To be clear, this Court has been proffered none of two things. One, any excuse for why this took 112 days. All of this phantom nonsense about maybe can't get a hearing. Let's go back kind of to the analysis. I understand that you're saying that there's this time frame, and there's been no explanation of what the time frame was. But I'm back to exactly what is this Court's role right now. Okay. Isn't it true that, while you've cited some earlier cases, the courts recently, Bill Laird, M.I., James Sullywood, et cetera, have said that courts presume the language issuing a procedural command to a governmental official indicates an intent that the statute is directory. This presumption, so it's presumed as directory, is overcome, and the provision will be read as mandatory either under two conditions. One, when there is negative language prohibiting further action in the case of noncompliance. Or two, when the right, the provision is designed to protect, would generally be injured under a directory reading. So there's a presumption it's directory, right? I would agree with you there's a presumption it's directory. Okay. It's only overcome under these two circumstances, correct? I disagree with that. Okay. This is the second part of that, meaning I agree there's two exceptions. What language we're debating is whether the Supreme Court's ruling, which is changing the standard, is it the person that's designed to protect or is it any public interest or right? Well, this Court more recently has said, quote, when the right, the provision is designed to protect, would generally be injured. And I believe that that was specific to that case. And I think that that's a little bit different because in that case, the person whose rights were being affected was the person who was seeking something. In this case, the nursing home's not seeking a hearing. I don't care about the hearing. What I care about is protecting my residents and enforcing my contract. The Department of Public Health requires under the statute I have already commented on. Isn't the question not what you're interested in, but what is the legislature's intent? What were they trying to do when they chose these languages? Whose rights were they trying to protect in this statute? They were trying to protect, I would argue, both. Because the problem is that the legislature passed a statute, and the statute says the Department of Public Health can take an infinite amount of time. Because that's the second thing you haven't heard is any time period as to what it should be, even though it's been asked a million times. If it isn't ten days, what's the amount? Infinity. So assuming it's infinity, had the statute and legislative intent be, the Department of Public Health can have infinity to have a hearing. And during that time period, which is exactly what's happening, we're compelling you to render compulsory treatment, care, food, water, and supplies for which you can get sued, and you have to assume a medical malpractice. This statute starts out two ñ it begins in two ways. One, rights of residents. Two, responsibilities of facilities. Three, licensing, regulation, et cetera, of facilities. I mean, the statutory structure is to protect right ñ I mean, it starts right at the beginning. Number one, rights of the residents. I agree. And then licensing, regulation, et cetera, of the facilities. The statute's construction from the first sentence balances those rights. It says the rights of the ñ we're going to look at the rights first of the residents, and then the responsibilities of the facilities. And I'll respond to that. I agree with you that the Nursing Home Care Act is designed to protect the residents' rights. And to that, I have several things to say. What right do they have to stay in a facility and not pay? What right does a resident have to be a danger to himself or others, which is the only other reason they can be discharged? And what right do they have to stay in a facility with no medical need and take up a pay? Or they have a right to a hearing. And the flip side ñ And let us ñ They can give them their hearing in ten days, Justice. I'm not saying they don't get their hearing. I'm saying that the statute becomes unconstitutional when they're shifting the burden of not ñ It's not the hearing. They can get their hearing. They can get it in ten days. When it takes longer than ten days, the statute might as well read, I have to take the resident home and the state's commanding me to take care of them. And that would be unconstitutionally shifting all of this to one subsection of the state of Illinois. Additionally, there's no right to stay in a facility and not pay. They have a right to a hearing. Give them their hearing. Give it to them in ten days, which is exactly what the legislator said should happen. Otherwise, if the statute had said an unfettered amount of time, it would have been constitutionally challenged before we got out the door. It's only being enforced that way now, which is why we're here now. In addition to the points raised by Justice Tice, we've consistently focused on whether a statute dictates consequences for noncompliance. And we have, in the case of N. James W.V., where the language was, shall not extend beyond 15 days except continuances. And we said that was not mandatory. How do you respond to that? Both of those questions. What are the adverse consequences? Are the consequences for noncompliance penalties anything else in the statute? The consequences for noncompliance, if I'm understanding your question correctly, is that the facility is, is that what you're asking me? I'm asking you what in the statute says there are consequences for noncompliance, a ten-day hearing. It does not. So I would concede that point. However, and this also gets back to resident rights under the Nursing Home Care Act, if we're going to interpret the statute to protect resident rights, resident rights are better protected by getting their hearing timely. If, in fact, the discharge is improper, their rights are better served by getting it timely. Secondly, you can protect the resident rights by giving them a ten-day hearing, but you're not protecting the rights by making it discretionary. You're expanding the resident rights. And that's not what interpretive guidelines are for. So you're expanding the rights of nonpaying customers over paying customers, and that's not proper legislative interpretation of the statute, and that's our position on that. In fact, that's what we believe. But there is no question that there is a public harm that comes, and in interpreting a statute to allow the department to take as much time as they want forces a facility to render compulsory medical care. We simply don't have that. It's not only tortiously interfering with the facility's contract with the resident, which the act itself requires me to have, including a payment provision, assuming it's nonpayment. It also would conflict with the statutory requirements that there be a need for a skilled vet. You can't just go to a nursing home because you want to stay there. You have to have a pass or screen, and there has to be an actual need for you to be in a home where I'm not allowed under law to have you there. So what's happening is by rendering this discretionary, which you have in this case, you have in this case the Department of Public Health is telling you for no reason whatsoever, I'm going to take 112 days to have my hearing, and I'm going to take as long as I want to render my opinion. But in the interim, you have to house, feed, clothe, provide medication, therapy, services, laundry, water, recreation, air conditioning, 24-hour nursing care, linens, bed changes, soil changes. Doctors don't have to render that care. Against my will, because I'm saying I no longer want this person in here under the act, under the provisions that they get, because these residents have a right to stay, but the exception to that right to stay is the involuntary discharge. So at that point, they no longer have a right to be in the facility because an involuntary discharge petition has been filed. If the department doesn't get its hearing in ten days, the resident has a right to go after the department. But why does the facility have to pay for that? And it would be an absolute unconstitutional taking of my bed, of my services, of my compulsory staff members to render care against my will past ten days because the statute is infinity, if that's what this court's interpreting. And despite being asked multiple times, if it isn't ten and fourteen days, what's the time period, the answer we get is, well, we don't know, let's ask the legislature. Well, we did ask the legislature. And in the case that's cited in the brief, the courts have indicated that... So at this point, Your Honor, we're asking that when the court renders its opinion regarding interpretation, we ask that the court look at the plain language, ten and fourteen, we ask that this court look at the entire statute, which comprised a 34-day cycle, which would be the maximum time limit for having this hearing, and we ask that this court consider the constitutionality of an unlimited amount of time yet shifting the expense and the burden to the nurse-at-home operator through no fault of their own. Thank you. Thank you. Reply. Ms. Turner is positing an approach here that seems as if it would be all or nothing. If there's not a mandatory construction that cuts off action outside ten days or fourteen days, then the time frame becomes infinity, then nothing can be done. And this is not to say that there are never any time constraints, regardless of what might happen in a particular case. It might be the case that administrative delay gives rise to some claims in a particular case, but that's not the claim they make. There's also some reference to, well, this might lead to an unconstitutional situation. They have never pursued or brought any constitutional claims. They have provided nothing that would suggest that a directory construction in and of itself would lead to some type of unconstitutional result, given that the delay could affect the nursing home. If there was a claim they wanted to bring, they didn't. What is the nursing home's remedy if the department unduly delays a hearing for whatever reason? They may have remedies for – they mentioned these potential constitutional claims. They have never developed them. Perhaps administrative delay could give rise to something like that if there was some type of pattern of delay. The record here – Just one delay of a year, let's say. What is the nursing home's – if they're pushing for a hearing and the department refuses to schedule it for no reason and there are no consequences provided for in the statute, such as dismissal of the request by the department to keep them there, but I guess it's a petition from the nursing home for involuntary discharge. Well, one thing they could do is pursue a mandamus remedy. Ms. Turner has said in her brief that that would not be available to them, but that's not correct. They cite a case that talks about mandamus as a substitute for a review of final administrative decisions. That's different. Mandamus simply to ask the court to require the department to hold a hearing, since the statute does require the department to hold a hearing, would be a different situation. So that is something that they would have available to them. They also, in this case, did not ask the department to expedite the matter in any way. Their specifics there – They did request a hearing. They did request a hearing. But the idea that the department was somehow refusing to proceed or simply not moving forward is not borne out by the record. After the Medicaid application was denied, the record shows that one step followed another in relative proximity, and ultimately there was a decision in favor of facility. But that was really only two months between the application for the Medicaid, November 2, 2013, and it was denied on January 13, 2014. So that was just two months, but there's a long time between the denial and the actual decision by the ALJ, April. Yeah. The time period here was about, from the denial of Medicaid, the decision was about three months and three weeks in this case. They have not pursued any claims, though, that are specific to this case or any type of claim based on the delay in this case. To the extent they have any of those claims, whether they're constitutional and they have this ability to pursue a mendamus action, none of that is what they did. One and only claim that they brought here was a mandatory directory claim, meaning that in every case, regardless of the circumstances, nothing to do with what happened in this case. In every case, you cut off that hearing process outside of ten days, and that's what we feel the legislature could not have intended and that a mandatory construction would effectively nullify the hearing process that the legislature put in place to protect residents against the wrongful loss of their care for their residents. Does the directory interpretation mean that there are virtually no time limits? No, it does not mean that there are no time constraints. It simply means that I can't say it would be this amount of time or it would expressly be this amount of time because we're not saying the legislature specified a time period. It is fired to have those hearings in ten days. We're not saying that the legislature didn't want prompt hearings. We're saying that the legislature didn't want to cut off that process outside that time period. And as I said, administrative delay might lead to other claims. There might be a point at which the department could not take action, but those aren't the claims that are pursued here. This is ten days for nothing. Another point that was raised was... The 34-day cycle, that would have to be discretionary as well, right? This is addressed in the brief. There is not a 34-day discharge cycle. That language, no later than, undercuts that because it's specifying that the later action can be the department's decision. That could happen in more than 34 days. That recognizes that that can happen. And again, there are other legislative provisions that I've talked about, the attorney, the subpoena, so on, that are also inconsistent with that time frame we're looking at as a whole. That same provision also specifies that there's going to come a place where there will be a decision by the department, which again is suggesting that the department's decision is a precondition for removal. I'd like to quickly address... You know, I just want to ask a question. Short of that 1960 case, just this whole discussion about the protection of the rights, the purpose of the Act as far as protection of the rights. And again, it goes back to my first question, this general versus the specific. I mean, what about the rights of someone who is entitled to a bed that isn't there as a result of somebody that's going to be found wrongfully in that bed? I mean, wasn't there a balancing act here by the legislature in coming up with this? I don't think that we can conclude. The facility is going back to let's focus on their rights and derivatively on the way that this reportedly affects the public. I'm not only talking about their rights, their rights to get paid. I'm talking about nursing home residents generally, their rights. I think they make reference in their briefs to the fact that perhaps if someone isn't paying that the charges are somehow going to be incurred by the other residents in there. And that's why I ask, could the legislature have been doing a balancing act here in coming up with these time constraints? I think at the end of the day it's not reasonable to conclude that with the purposes of the Nursing Home Care Act, with the legislature specifically creating a hearing process to protect residents from the wrongful loss of the care and the residents in the facility, with their creation of a process where the facility can only evict them for these very specific reasons, that regardless of these other attenuated considerations, and that may pose constraints on the facility, there may be other considerations that come into play in an attenuated way. Just before you sit down, what are the practicalities here? How long is the hearing? An hour? Two hours? Well, that's certainly the portrait that Lakewood portrays, that these are invariably fast and easy. There are two amicus briefs filed by legal aid organizations that practice in this area, and they paint a very different picture of the considerations that go into the time frame. What are the typical reasons for not being able to get it done in 10 days? The department, I think a number of things go into that picture. The department has additional statutory obligations. There are many situations when the resident is not able to meaningfully participate within that 10-day window, and additionally, as I've mentioned, the statute expressly tells the department to do certain additional things, or allow certain additional things, like the attorneys, the subpoenas, the multiple-step administrative process, that is inconsistent with the 10 days. The test, as Mr. Brooks portrayed it, about the... And finally, I think we have to keep in mind that the facility is paying a lot on this involuntary transfer of discharge proceeding when they talk about their interests and the public's interests. This is one small part of a heavily regulated area that has a lot of moving parts. A lot of components affect nursing home costs and viability, and they're hanging a lot on a system where occasionally a resident can test involuntary discharge. Your time has expired if you've answered Justice Thomas's question. Thank you. Thank you. Case number 124019, Lakewood Nursing and Rehabilitation Center v. Department of Public Health, will be taken under advisement as agenda number eight. Ms. Wunder, Ms. Turner, we thank you for your arguments. You are excused.